**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RICHELIEU FOODS, INC.,      ) | |
|      ) | |
|     Plaintiff,      ) | |
|      ) | No. 12 C 7005 |
|     v.      ) | |
|      ) | Judge Sara L. Ellis |
| NEW HORIZON WAREHOUSE      ) | |
| DISTRIBUTION CENTER, INC., d/b/a NEW   ) | |
| HORIZON DISTRIBUTION SYSTEMS, INC., ) | |
| an Illinois Corporation, and RAY EMERICK'S ) | |
| WAREHOUSE CO., INC., an Illinois      ) | |
| Corporation,      ) | |
|      ) | |
|     Defendants.      ) | |

## OPINION AND ORDER

Plaintiff Richelieu Foods, Inc. ("Richelieu"), a private label food company, brought this lawsuit against Defendants New Horizon Warehouse Distribution Center, Inc. ("New Horizon") and Ray Emerick's Warehouse Co., Inc. ("Emerick") for breach of contract and fraud arising out of New Horizon's alleged failure to properly invoice Richelieu for warehouse storage charges.[1] Before the Court is New Horizon's motion for summary judgment [58], which is granted in part and denied in part. There is a disputed question as to whether New Horizon waived enforcement of the notice provision through its course of conduct in attempting to address billing disputes after the time to dispute the majority of the invoices at issue had passed. A dispute also exists as to whether the parties agreed to modify the billing provisions of their agreement through their course of conduct. Finally, there is a disputed question as to whether Richelieu justifiably relied on New Horizon's alleged billing misrepresentations or should have instead conducted its own

---

[1] Emerick is alleged to have been affiliated with New Horizon from 2009 to 2012 and to have assumed New Horizon's debts and liabilities in 2012.

investigation based on the information available to it. But because there is no evidence that New Horizon agreed to maintain invoicing accuracy at a 99.5% standard, Richelieu may not pursue its breach of contract or fraud claims with respect to that issue.

**BACKGROUND**[2]

Richelieu is a private label food company that operates manufacturing facilities throughout the country, including in Elk Grove Village, Illinois. On July 1, 2009, Richelieu entered into a warehouse services agreement with New Horizon for warehouse storage and services at New Horizon's facilities in Itasca, Illinois. Pursuant to that agreement, New Horizon was to provide Richelieu with storage for Richelieu's food products, handling, and other accessorial services at New Horizon's warehouse facility. Section 2.6 of the agreement provided:

> [Richelieu] requires, and [New Horizon] agrees to provide at the Facility, the use of, at all times during the Term of this Agreement, 3,000 storage rack positions in [New Horizon's] ambient storage area and 250 storage rack positions in [New Horizon's] refrigerated storage area. Each storage rack position is able to accommodate one pallet of Product configured as stated in Exhibit B to this Agreement. . . . [Richelieu] agrees to pay [New Horizon] a set monthly storage fee (the "Fixed Monthly Storage Charge") as set forth in Exhibit A to this Agreement for the 3,250 storage rack positions whether or not Products are stored in any or all of the 3,250 storage rack positions. [New Horizon] shall invoice the Fixed Monthly Storage Charge monthly in advance on or before the first day of each month during the Term of this Agreement. In the event that [Richelieu] requires more than 3,000 storage rack positions in the ambient storage area and/or more than 250 storage rack positions in the refrigerated storage area (individually and collectively "Overflow Storage") for the storage of Products during any one or more months during the Term of this Agreement,

---

[2] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1. They are taken in the light most favorable to Richelieu, the non-movant. The Court has considered the parties' objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment.

> [Richelieu] shall pay the per pallet Overflow Storage Charge stated
> in Exhibit A to this Agreement for each pallet of Product in
> Overflow Storage as of the last day of each such month during the
> Term of this Agreement.

Ex. C to Def.'s L.R. 56.1 Stmt. § 2.6. Exhibit A to the agreement provided several different overflow storage rates, for "Dry 15 Days Inbound Storage," "Dry 15 Days Recurring Storage," "Refrigerated 15 Days Inbound Storage," and "Refrigerated 15 Days Recurring Storage." *Id.* Ex. A. Pursuant to Exhibit A, the Overflow Storage Charge was to be charged on a 15-day basis. Exhibit A also specified the price for handling and other services. Section 2.3 of the agreement, titled "Price and Payment Terms," provided:

> All invoices issued by [New Horizon] are payable upon receipt by
> [Richelieu]. [Richelieu] must notify [New Horizon] of any dispute
> relating to any invoice or portion thereof within thirty (30) days of
> receipt of the invoice or will have waived such dispute.

*Id.* § 2.3. James Campbell, Richelieu's vice president of manufacturing at its Elk Grove Village facility, was aware of the 30-day notice provision.

Exhibit B to the Agreement provided certain key performance indicators ("KPI") for the agreement. Specifically, New Horizon was required to provide order accuracy, on time shipping, and inventory accuracy (as it related to physical inventory) at a 99.5% standard, and damage monitoring at a 99.975% standard. Inventory accuracy is a comparison of the book record showing of products to the actual quantity of products in the warehouse. The agreement did not specify a KPI for invoicing accuracy.

To keep track of its products, Richelieu used an enterprise resource planning ("ERP") system called JustFood, which was specifically designed for food processing and manufacturing. JustFood included an inventory program that identified inventory by location, so that it was possible to determine how many stock keeping units ("sku") or cases were at New Horizon at

any given time.  Richelieu also had a general spreadsheet that it could use to estimate the number of pallets of product necessary for a certain number of cases or skus.

Additionally, when goods were transferred from Richelieu's Elk Grove Village facility to New Horizon, Richelieu generated a bill of lading and a packing slip.  The bill of lading included a general description of the products included in the shipment and the number of pallets being transported.  The packing slip indicated the total number of cases that were transported.  When New Horizon received the goods, it issued a warehouse receipt to Richelieu.  The receipts identified the particular skus and number of cases received.  The receipts were sent to Richelieu's Vicky Knaack or Mark Windt, the plant controller at the Elk Grove Village facility. Richelieu would then match the warehouse receipt against the bill of lading to ensure there were no discrepancies.  If there were discrepancies, Windt would contact New Horizon to have them addressed.

For Richelieu goods shipped from New Horizon to Richelieu customers, Richelieu received bills of lading and packing slips generated by New Horizon.  These outbound bills of lading included the total number of cases and pallets that left the warehouse and described the items shipped.  The bills of lading and packing slips were sent to Richelieu's customer service department in Iowa.  Richelieu would then invoice its customers and reduce its inventory in the JustFood ERP system.

New Horizon sent a number of different invoices to Richelieu for its services.  It issued weekly invoices for accessorial services.  These invoices summarized all the items that New Horizon received from Richelieu's facility as well as all shipments that left New Horizon's facility over the previous week.  Windt's receptionist performed a full audit of these weekly invoices to ensure they were correct.  New Horizon also invoiced Richelieu monthly for the

Fixed Monthly Storage Charge and on the 1st and 15th of the month for any Overflow Storage Charges. Windt reviewed these invoices for reasonableness, after which, if there were no issues, he would initial the invoices and send them to corporate headquarters for processing and payment. Richelieu paid all invoices from May 2009 through the end of December 2011.

On July 22, 2010, Windt emailed Gail Boulos, the administrative assistant to Laura Dickerson, New Horizon's president. Windt inquired about Invoice 300098H, asking "Can you help me understand how this report is calculated vs. the monthly storage?" Ex. 5 to Ex. B to Def.'s L.R. 56.1 Stmt. at D0047. After some discussion among Windt, Boulos, Dickerson, and Alan Dickes, New Horizon's IT Director, Dickerson explained to Windt:

> We invoice weekly based on the inbounds pallets that are received per product category. We them [sic] generate a storage invoice on the 1st and 15th of every month based on what is on hand after the two weeks. The system maintains the receipt date and only generates the storage invoice based on what has been in inventory past the 15 day.

*Id.* at D0045. Windt clarified that he was concerned with the invoice at issue because the number for the "the monthly storage pallets was very close to the 2 week pallets which is where I couldn't understand how this was being calculated." *Id.* Windt and Dickerson then spoke by phone. Windt testified that in that conversation Dickerson told him that New Horizon was "billing per the contract." Ex. E to Def.'s L.R. 56.1 Stmt. 108:12–13. Windt did not review the contract to verify that this was true, however. After their conversation, on August 19, 2010, Dickerson sent the following email to Windt:

> This email serves as confirmation of our conversation regarding the above Inbound storage invoice. As we discussed once the on hand pallets exceed the fixed quantity of 3,250 pallet positions on hand at the beginning of the month we will bill the Inbound storage per pallet received within that month.

Ex. 5 to Ex. B to Def.'s L.R. 56.1 Stmt. at D0044. Windt then authorized payment of Invoice

No. 300098H.

About a year and a half later, on December 6, 2011, Windt emailed Boulos, Dickerson,

and Helen Haaland, New Horizon's Inventory Control Manager, asking to review "the time

frame covered as well as the calculations" for three invoices, Nos. 300916H, 300922H, and

300940H. Ex. 6 to Ex. B to Def.'s L.R. 56.1 Stmt. Dickerson responded the next day by email:

> I have reviewed the three invoices and the billing breakdown is as
> follows:
>
> 1. 300916H – 10.31.11 This is the storage for all products
> received within the 15 days from 10.16.11-10.31.11. There are
> two charges on the contract one for Inbound storage on ambient
> items and Inbound storage on 40 degree items.
>
> 2. 300922H – 11.01.11 This is the fixed storage charges which are
> invoiced the first of every month. When the on hand pallet balance
> exceeds the 3,250 pallets we bill the recurring storage charges as
> defined on our contract.
>
> 3. 300940H – 11.16.11 This is the storage for all products
> received within the 15 days from 11.01.11-11.15.11.
>
> This can get confusing yet it really just breaks down to storage
> upon receipt and recurring storage based on the fixed. I truly hope
> I was able to answer your questions if not just give me a call.

*Id.* Windt considered these statements to be consistent with those Dickerson made in August

2010 as to how New Horizon billed for overflow storage.

In January 2012, Richelieu hired A.T. Kearney, a management consulting company, to

review its warehousing logistics. Stuart Klein, an A.T. Kearney analyst, was assigned to the

project. Klein requested and received data from New Horizon, including files providing monthly

pallet in and pallet out totals for 2011 separated by pallet type. Klein concluded that New

Horizon had been overbilling Richelieu for storage, a conclusion he shared with Richelieu and

New Horizon.  Windt later continued Klein's analysis, using the weekly invoices and inbound and outbound bills of lading to determine what charges Richelieu believed to be appropriate.

On March 22, 2012, representatives from Richelieu and New Horizon met and discussed various issues, including Richelieu's claim that it had been overpaying for storage throughout the course of the parties' relationship.  The parties did not reach a resolution of the invoicing dispute at that meeting.  On March 26, 2012, Dickerson sent Richelieu a letter summarizing its position on the issue:

> As you know, we have been working with your company and your consultant to attempt to identify what your company claims are alleged errors in invoices which we issued to your company during the course of our relationship.  While I disagree that New Horizon improperly invoiced your company for services at any time, in view of our business relationship with your company and the potential to continue doing business with your company, we initially agreed to examine the issue.
>
> Based upon our meeting with your company and your consultant last Thursday, it became clear that we will no longer continue to do business with your company after our current agreement ends on September 14, 2012. . . .  [W]e intend to continue to enforce the terms and conditions of our Warehouse Services Agreement (the "Agreement") with your company.  Paragraph 2.3 of the Agreement provides, in relevant part, that "Customer must notify warehouse of any dispute relating to any invoice or portion thereof within thirty (30) days of receipt of the invoice or will have waived said dispute."  While I disagree that we failed to properly invoice your company for services under the Agreement, any dispute your company may have had relating to any invoice has been waived since your company failed to notify us of any dispute within the applicable 30-day time period.  Accordingly, we will no longer participate in any review of invoices for alleged invoicing errors.

Ex. I to Pl.'s L.R. 56.1 Stmt.  This was the first time the 30-day notice provision of Section 2.3 was raised with Richelieu.

On April 12, 2012, Windt sent Dickerson a letter further disputing New Horizon's manner of billing for storage:

> Attached is a worksheet detailing the most recent storage invoices
> that are currently in dispute. As previously communicated, we are
> also disputing many of the invoices charged for inbound storage
> going back to 2009 that were invoiced incorrectly per the contract
> (Section 2.6). Attached are the details to support the amounts
> being paid against invoices 301077H & 301135H. Invoices
> 301044H, 301117H and 301156H relate to storage charges for the
> 2nd half of the respective month and are ultimately duplicate
> charges as these fees are also billed on the first of the following
> month as part of the "Monthly Fixed Storage" invoice. As they
> duplicate charges we have not included payment for invoices
> 301044H, 301117H and 301156H.

Ex. 11 to Ex. B to Def.'s L.R. 56.1 Stmt. On June 21, 2012, Dickerson informed Windt that if

Richelieu did not pay the unpaid amounts on its invoices—$171,632.38—by June 27, 2012, New

Horizon would exercise its general warehouse lien and sell the products in its possession. On

June 25, 2012, Richelieu formally terminated the agreement, claiming that New Horizon had

failed to cure its past breaches of the agreement, which included failing to reimburse Richelieu

$493,413.00 in what it considered "excessive and improper storage charges." Ex. L to Pl.'s L.R.

56.1 Stmt.

Despite the breakdown in the parties' relationships, Dickerson and Dickes acknowledged

during their depositions that the way New Horizon invoiced Richelieu for overflow storage did

not comply with Section 2.6 of the agreement, although they maintained that New Horizon

complied with Exhibit A of the agreement. Windt admitted that he does not believe that New

Horizon's alleged improper billing was malicious or that New Horizon was trying to cover up or

hide any improper billing. Similarly, Klein testified that the method New Horizon used was

"faulty," but that this "wasn't intentional, but, instead, an accident due to misunderstanding."

Ex. G to Def.'s L.R. 56.1 Stmt. 93:22–94:10. Campbell acknowledged that the problem was not

that the number of pallets stored at New Horizon was misrepresented but rather that New

Horizon incorrectly invoiced Richelieu.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I. Notice Provision, Delay, and Waiver

New Horizon first argues that summary judgment should be granted in its favor on Richelieu's breach of contract and fraud claims because Richelieu waived any claims it had related to invoicing prior to April 12, 2012 by not timely notifying New Horizon of the alleged disputes. New Horizon relies on Section 2.3 of the agreement, which provides that failure to notify New Horizon of "any dispute relating to any invoice or portion thereof within thirty (30) days of receipt of the invoice" operates as a waiver of the dispute. Ex. C to Def.'s L.R. 56.1

Stmt. § 2.3.  Such notice provisions are routinely enforced.  *See Strom Eng'g Corp. v. Int'l Fiber Corp.*, No. 3:12-CV-035, 2013 WL 5274704, at *5–6 (S.D. Ohio Sept. 18, 2013) (enforcing notice provision regarding disputed invoices); *Barber Auto Sales, Inc. v. United Parcel Servs., Inc.*, 494 F. Supp. 2d 1290, 1295–96 (N.D. Ala. 2007) (plaintiff's failure to comply with notice provision entitled defendant to judgment on breach of contract claim); *Powers Law Offices, PC v. Cable & Wireless USA, Inc.*, 326 F. Supp. 2d 190, 193 (D. Mass. 2004) (collecting cases strictly enforcing similar notice provisions in the telecommunications area).

Richelieu argues, however, that the notice provision does not apply to bar its claims for several reasons.  First, Richelieu maintains that its dispute does not relate to invoices but rather "stems from New Horizon's systematic breach and fraudulent application of the entire Agreement itself" and thus falls outside of the notice provision.  Doc. 84 at 7.  This essentially amounts to an argument that the notice provision applies only insofar as the invoice is correct.  But "[t]his argument is without merit and renders the Waiver Provision a nullity" for "interpreting the Waiver provision as only restricting the right of a billed party to challenge a correct and properly chargeable invoice . . . would render such provision practically meaningless."  *P.R. Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 96 (1st Cir. 2011).  The notice provision instead must be read as applying not only to charges that were proper but also to charges that may have been improper under the terms of the agreement.  *Id.*  Indeed, although in the context of determining whether to require arbitration, the Seventh Circuit concluded that a provision requiring arbitration of disputes over invoice amounts covered claims that the defendant committed fraud "through various misrepresentations of the number of lines it had transcribed and the intentional billing of [plaintiff] for a substantially greater amount," in addition to claims that the defendant "breached the contract through overcharging."  *Welborn*

*Clinic v. MedQuist, Inc.*, 301 F.3d 634, 640 (7th Cir. 2002). Here, the notice provision is broader than in *Welborn Clinic*, for it includes "any dispute relating to any invoice or portion thereof." Thus, Richelieu's attempt to artificially narrow the notice provision fails. *See id.* (noting that the arbitration provision did not even require arbitration of all claims "related to" or "arising out of" invoice disputes but rather was narrower in requiring arbitration only of disputes over invoice amounts).

Next, Richelieu relies on the wrongful prevention doctrine, arguing that to the extent the notice provision applies, Richelieu's compliance is excused because of New Horizon's wrongful and fraudulent conduct. The wrongful prevention doctrine provides that "a party who prevents the fulfillment of a condition upon which his own liability rests may not defeat his liability by asserting the failure of the condition he himself has rendered impossible." *Cummings v. Beaton & Assocs., Inc.*, 618 N.E.2d 292, 303, 249 Ill. App. 3d 287, 187 Ill. Dec. 701 (1992). The doctrine operates as an estoppel, "prohibit[ing] a party from profiting through his own wrongdoing." *Id.* Richelieu argues, in line with its fraud claim, that New Horizon misrepresented that it was invoicing Richelieu in accordance with the agreement. According to Richelieu, absent these misrepresentations, it would have been able to determine that there was an issue with the invoices within the appropriate time period. But Richelieu has not presented any evidence that New Horizon actively concealed information from Richelieu to keep Richelieu from determining whether the invoicing was being done in accordance with the agreement. There is nothing to suggest that Dickerson's statements and explanations on two occasions that the billing was being done in accordance with the agreement prevented Richelieu from conducting its own review to ensure compliance with the agreement. *Cf. Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 543 (7th Cir. 1996) (evidence in the record clearly demonstrated that

"but for Ameritech's repeated written and oral misrepresentations to Mr. Swaback, he would have signed the election form, thereby meeting all the requirements for the lump sum payment in lieu of a monthly service pension").  Indeed, Richelieu conducted such a review—unobstructed by New Horizon—in early 2012.  The evidence in the record demonstrates that Richelieu could have performed this same review after receipt of every invoice with the bills of lading, invoices, and other information it maintained in its ERP system to determine whether each invoice it received complied with the agreement's billing procedures.  And although Klein obtained some documents from New Horizon in order to proceed with his project, there is nothing in the record to suggest that Richelieu could not have obtained these documents at any other time from New Horizon upon request or that New Horizon was actively concealing its records from Richelieu.[3]

*Cf. Kaiser Found. Health Plan, Inc v. Medquist, Inc.*, No. Civ. 09-4376 (JBS), 2009 WL 961426, at *5 (D.N.J. Apr. 8, 2009) (refusing to apply waiver provision at motion to dismiss stage where plaintiffs alleged that defendant actively concealed nature of inflated billing by refusing to release information about manner in which its invoices were calculated).  Thus, the wrongful prevention doctrine is inapplicable here.

Richelieu further argues that New Horizon waived enforcement of the notice provision.  Waiver is the voluntary and intentional relinquishment of a known right and may be express or implied.  *Wells v. Minor*, 578 N.E.2d 1337, 1346, 219 Ill. App. 3d 32, 161 Ill. Dec. 691 (1991).  New Horizon may have impliedly waived the notice provision through conduct inconsistent with the intent to enforce that provision.  *Id.*  Implied waiver may be found where an unexpressed

---

[3] The failure to provide sufficient information would not toll a notice provision unless there is evidence of bad faith.  *See Lamm v. State St. Bank & Trust*, 749 F.3d 938, 945–46 (11th Cir. 2014) (rejecting argument that waiver provision not enforceable where bank did not provide sufficient information to detect error in the absence of bad faith on the part of the nondisclosing party or a controlling statute like U.C.C. § 4-406); *P.R. Tel. Co.*, 662 F.3d at 97 (rejecting argument that waiver provision was "tolled until the billing party provides sufficient information that would enable the billed party to detect any errors in the billing" as there was no such exception included in the waiver provision).

intention to waive can be clearly inferred from the circumstances or New Horizon's conduct misled Richelieu into a reasonable belief that a waiver occurred. *Batterman v. Consumers Ill. Water Co.*, 634 N.E.2d 1235, 1236, 261 Ill. App. 3d 319, 199 Ill. Dec. 881 (1994). "A party to a contract may not lull another into false assurance that strict compliance with a contract duty will not be required and then sue for noncompliance." *Wells*, 578 N.E.2d at 1346. Waiver may be a question of law where there is no dispute as to the material facts, but if the facts necessary to support waiver are disputed or reasonable minds could draw different inferences from the evidence, it is a question of fact for the jury. *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009).

Here, New Horizon did not raise the notice provision until March 26, 2012, after it had been working with Richelieu and its consultant, Klein, to address "alleged errors in invoices which [New Horizon] issued to [Richelieu] during the course of [their] relationship." Ex. I to Pl.'s L.R. 56.1 Stmt. Klein's analysis encompassed not just the most recent invoice that would have fallen within the notice provision but all invoices going back to 2009—well outside of the time limit if New Horizon was strictly enforcing the notice provision. Dickerson's March 26, 2012 letter further suggested that New Horizon was invoking the notice provision only after determining that a future business relationship with Richelieu was no longer a possibility. *See* Ex. I to Pl.'s L.R. 56.1 Stmt. ("[I]n view of our business relationship with your company and the potential to continue doing business with your company, we initially agreed to examine the issue. Based upon our meeting with your company and your consultant last Thursday, it became clear that we will no longer continue to do business with your company after our current agreement ends . . . . [A]ny dispute your company may have had relating to any invoice has been waived since your company failed to notify us of any dispute within the applicable 30-day time period.

Accordingly, we will no longer participate in any review of invoices for alleged invoicing errors."). New Horizon's actions could reasonably be viewed as having led Richelieu to understand that the notice provision was waived, particularly where it had never been invoked previously. Thus, there is at least a question of whether New Horizon's conduct can be read to support a finding of waiver, which precludes granting summary judgment in New Horizon's favor. *Cf. McFadyen Consulting Grp., Inc. v. Puritan's Pride, Inc.*, 928 N.Y.S.2d 87, 89 (N.Y. App. Div. 2011) (summary judgment properly granted where party did not raise a triable issue "as to whether it timely gave written notice to McFadyen that it disputed any invoices at issue, or as to whether McFadyen waived, either orally or in writing, the requirement of timely written notice of disputes as to invoices"). This dispute regarding waiver also applies to bar summary judgment based on New Horizon's argument that Richelieu waited too long in notifying New Horizon of the dispute regardless of the notice provision, for again New Horizon's actions could be read as suggesting that such delay did not matter.

Finally, Richelieu argues that enforcing the notice provision with respect to its fraud claim would be against public policy. But several Illinois appellate court cases suggest that a party may contractually waive the right to bring a fraud claim, such as through the inclusion of a notice provision. *Krilich v. Am. Nat'l Bank & Trust Co. of Chicago*, 778 N.E.2d 1153, 1161, 334 Ill. App. 3d 563, 268 Ill. Dec. 531 (2002) (fraudulent misrepresentation claims dismissed based on contractual waiver); *RBS Citizens, N.A. v. RTG-Oak Lawn, LLC*, 943 N.E.2d 198, 204, 407 Ill. App. 3d 183, 347 Ill. Dec. 908 (2011) (suggesting that "claims of common law fraud can be waived"); *Bank of Am., N.A. v. 108 N. State Retail LLC*, 928 N.E.2d 42, 55, 401 Ill. App. 3d 158, 340 Ill. Dec. 323 (2010) ("[A] decision by a party to contractually agree to waive all defenses is permitted under Illinois law."). The notice provision is broad enough to include Richelieu's

fraud claim. *See Wellborn Clinic*, 301 F.3d at 640. Thus, although not dispositive because there is a disputed question as to whether New Horizon waived enforcement of the notice provision, the Court will not find the notice provision inapplicable to Richelieu's fraud claim.

## II.     Modification of the Agreement

Next, New Horizon argues that, by accepting and paying New Horizon's invoices, Richelieu modified the billing provisions of the agreement to conform to the manner in which New Horizon was calculating the storage charges. A valid modification requires offer, acceptance, and consideration. *Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 189, 348 Ill. App. 3d 461, 284 Ill. Dec. 58 (2004). "A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance." *Maher & Assocs., Inc. v. Quality Cabinets*, 640 N.E.2d 1000, 1007, 267 Ill. App. 3d 69, 203 Ill. Dec. 850 (1994). Whether a modification has occurred is a factual question. *Id.*

New Horizon maintains that, by paying invoices from the start of the agreement based on a billing method that may not have been set forth in the agreement, Richelieu acquiesced to a contract modification. But more facts are necessary before a trier of fact could conclude whether the agreement was validly modified. Any modification appears to have been inadvertent, as there is no evidence of a discussion of a deviation from the billing method set forth in the agreement or even an acknowledgment that the billing method that New Horizon used in fact deviated from that set forth in the agreement. Thus, there is at minimum, an argument that Richelieu did not ratify any new agreement and waive performance of the original agreement. *Cf. Davison v. Bd. of Trs. of Carl Sandburg Coll., Dist. No. 518*, 478 N.E.2d 3, 4–5, 132 Ill. App. 3d 980, 87 Ill. Dec. 864 (1985) (plaintiff was aware of modified offer and thus by performing

accepted the terms of the modified contract).  Moreover, New Horizon has not suggested what

consideration Richelieu provided for the purported modification or presented any case law to

support an argument that no consideration was necessary.  Because contract modification based

on a course of conduct is typically not properly decided on a motion for summary judgment, and

the argument is not well-developed by either party, the Court will not grant summary judgment

for New Horizon on this basis.  *See Coventry Health Care Workers Comp., Inc. v. Medicor*

*Managed Care, LLC*, No. 10 C 7814, 2012 WL 787058, at *2–3 (N.D. Ill. Mar. 9, 2012) (finding

that modification question raised issues of fact not appropriate for summary judgment);

*Household Fin. Servs., Inc. v. Coastal Mortg. Servs., Inc.*, 152 F. Supp. 2d 1015, 1023 (N.D. Ill.

2001) ("[W]hether the Purchase Agreement was modified-and the extent of that modification

(i.e., which provisions are modified and which remain enforceable)-are questions of fact which

are not properly decided on a motion for summary judgment.").

## III.    Fraud Claim

To prevail on its fraud claim, Richelieu must establish that (1) New Horizon made a false

statement or omission of material fact, (2) New Horizon knew of or believed in its falsity, (3)

New Horizon intended to induce Richelieu to act, (4) Richelieu acted in reliance on the truth of

New Horizon's statements, and (5) damages resulted from Richelieu's reliance.  *Weidner v.*

*Karlin*, 932 N.E.2d 602, 605, 402 Ill. App. 3d 1084, 342 Ill. Dec. 475 (2010).  Richelieu must

prove its fraud claim by clear and convincing evidence, and the Court is to evaluate the evidence

presented on summary judgment "through the prism of the substantive evidentiary burden."

*Anderson*, 477 U.S. at 254; *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d

853, 864 (7th Cir. 2013) (applying clear and convincing standard in affirming summary

judgment dismissal of fraud claim); *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 853–54 (7th Cir. 2007).

New Horizon first argues that Richelieu's claim fails because Richelieu cannot establish that it justifiably relied on any alleged misrepresentations. Specifically, New Horizon contends that Richelieu possessed or had access to all information that would have allowed it to determine whether New Horizon's billing method complied with the terms of the agreement. Because Richelieu had this information, New Horizon argues, Richelieu's reliance on the invoices or any other statements that New Horizon made regarding its billing method was not justified. "To determine whether reliance was justified, the court considers the facts the party knew and those facts which it could have learned through ordinary prudence." *JPMorgan Chase Bank, N.A. v. E.-W. Logistics, L.L.C.*, 9 N.E.3d 104, 121, 2014 IL App (1st) 121111, 380 Ill. Dec. 854 (2014). Richelieu may not claim that it was deceived by information provided to it by New Horizon if it had its "eyes closed." *Siegel Dev., LLC v. Peak Constr. LLC*, 993 N.E.2d 1041, 1060, 2013 IL App (1st) 111973 (2013). But, Richelieu need not have conducted an independent investigation if it did not have the same ability as New Horizon to discover the truth of the representations or if the facts were presumptively within New Horizon's knowledge and contained nothing so improbable as to cause doubt as to their truth. *Schrager v. N. Cmty. Bank*, 767 N.E.2d 376, 388, 328 Ill. App. 3d 696, 262 Ill. Dec. 916 (2002). Whether reliance is justified is usually a question of fact, but where only one conclusion can be drawn from the undisputed facts, the issue may be determined on summary judgment. *Siegel Dev., LLC*, 993 N.E.2d at 1060.

Richelieu argues in its response that New Horizon's "fraudulent invoicing method was not easily discernable, and could not have been discovered based on a review of documents or information in its possession." Doc. 84 at 23. But it is undisputed that the allegedly fraudulent

invoicing method was indeed discovered by Richelieu's consultant, Klein, based on information that was in Richelieu's possession or readily available to it. *See E.-W. Logistics*, 9 N.E.3d at 121 (estate failed to state fraud claim where it did not allege that decedent made any effort to obtain information about the status of the loans at issue). Thus, the evidence establishes that Richelieu had the ability to determine the allegedly improper nature of New Horizon's billing on its own. But this is not the end of the road for Richelieu's fraud claim, for it need not have conducted any investigation if the alleged misrepresentations were presumptively within New Horizon's knowledge and contained nothing so improbable as to cause Richelieu to doubt their truth. *Sims v. Tezak*, 694 N.E.2d 1015, 1020–21, 296 Ill. App. 3d 503, 230 Ill. Dec. 737 (1998) ("Illinois law has long held that, where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely upon it without investigation, even though the means of investigation were within the reach of the injured party and the parties occupied adversary positions toward one another."); *see also Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 9, 326 Ill. App. 3d 642, 260 Ill. Dec. 735 (2001) (plaintiff's failure to investigate may not be "fatal" where person making alleged misrepresentations has created a "false sense of security" in plaintiff); *Carter v. Mueller*, 457 N.E.2d 1335, 1340, 120 Ill. App. 3d 314, 75 Ill. Dec. 776 (1983) (same). New Horizon offers no meaningful response to this argument. And when Windt raised questions about certain invoices in 2010 and 2011, Dickerson assured him that the invoicing was being done according to the agreement, which could be viewed as creating a false sense of security. Drawing all reasonable inferences in Richelieu's favor, as the Court must in resolving New Horizon's summary judgment motion, there is at least a dispute as to justifiable reliance that must be resolved by the jury.

Additionally, New Horizon argues that Richelieu's fraud claim fails because New Horizon's invoices clearly set forth the overflow storage charges, it did not misrepresent the number of pallets it stored over certain periods of time, and its invoices were not vague. New Horizon only presents one invoice as an example to demonstrate that the number of pallets it had on hand was accurately stated on the invoice and that the invoice cannot be considered vague. The Court, however, does not understand Richelieu's argument to be that New Horizon inflated the number of pallets but rather that it misrepresented the number of pallets that should be charged at certain rates. The alleged fraud, as far as the Court understands it, was furthered by New Horizon's failure to provide detailed information on the invoices about how exactly it was calculating each storage charge. The Court has difficulty concluding whether the evidence would support these arguments where only one invoice has been submitted. Because New Horizon's argument is undeveloped and the Court is left guessing at both sides' positions on the issues, summary judgment will not be granted on these bases. Richelieu is reminded, however, of the high evidentiary burden it must meet to prevail on its fraud claim.

Finally, New Horizon argues that Richelieu's fraud claim is defeated by Richelieu's representatives' admissions that New Horizon had no intent to defraud. Specifically, Windt and Klein testified that they did not believe New Horizon acted maliciously or that it intentionally deviated from Section 2.6 of the agreement. Initially, Richelieu representatives' beliefs about New Horizon's motives are not relevant to establishing New Horizon's motives. And even so, New Horizon is demanding too much of Richelieu on this element of its fraud claim. All Richelieu must establish is that New Horizon intended that Richelieu act in reliance on the representations, i.e. that the alleged billing misrepresentations were made with the intent to induce Richelieu to pay the charges set forth in the invoices. *See Weidner*, 932 N.E.2d at 605.

Windt's and Klein's statements do not undermine this element. After Dickerson assured Windt that the invoices he questioned in 2010 and 2011 were billed according to the agreement, the record reflects that those invoices were paid. This suggests that the alleged misrepresentations were made to induce Richelieu to pay—and indeed had the intended effect. *See McCarthy v. Ameritech Publ'g, Inc.*, --- F.3d ----, 2014 WL 3930572, at *8 (6th Cir. Aug. 13, 2014) (finding that "the significant benefit that accrued to [defendant] as a result of its misinformation (and its silence)" was enough to create a question of fact as to whether defendant "intentionally or recklessly provided inaccurate information to [plaintiff] to obtain her free labor"). Thus, summary judgment is denied on the fraud claim, which must proceed to trial.

## IV.    Inventory Accuracy

Richelieu's breach of contract and fraud claims both rely on the contention that New Horizon agreed to maintain invoicing accuracy at a 99.5% standard. But the agreement only provides that New Horizon would maintain 99.5% inventory accuracy and does not include a KPI for invoicing accuracy. Although invoicing accuracy may be tied to inventory accuracy in some unspecified way, Richelieu has not provided any evidence to dispute New Horizon's evidence that it made no representations regarding invoicing accuracy. Thus, Richelieu cannot base its breach of contract or fraud claims on an agreement that New Horizon maintain invoicing accuracy at a 99.5% standard.

## CONCLUSION

For the foregoing reasons, New Horizon's motion for summary judgment is granted in part and denied in part. Richelieu cannot pursue its breach of contract and fraud claims based on New Horizon's alleged breach of an agreement to maintain invoicing accuracy at a 99.5% standard. New Horizon's other grounds for summary judgment are denied.

Dated: September 9, 2014

_____
SARA L. ELLIS
United States District Judge